IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATHLEEN BOGAR, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 08-1871 (JBS) |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert Anthony Petruzzelli, Esq.
JACOBS, SCHWALBE & PETRUZZELLI, PC
Woodcrest Pavilion
Ten Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Sheena V. Barr, Special Assistant United States Attorney
SOCIAL SECURITY ADMINISTRATION
26 Federal Plaza
Room 3904
New York, NY 10278
     Attorney for Defendant

**SIMANDLE**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration denying the application of

Plaintiff, Kathleen Bogar ("Plaintiff"), for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 401-434.  The Court must decide whether

substantial evidence supports the determination of the

Administrative Law Judge ("ALJ") that Plaintiff had the residual functional capacity to perform her past work before her insured status expired, thus rendering her ineligible for DIB.  The Court, for the reasons set for below, finds that the opinion of the ALJ is supported by substantial evidence and will therefore affirm the decision of the Commissioner of Social Security to deny Plaintiff's application for DIB.

**I.    BACKGROUND**

**A.    Procedural History**

Plaintiff filed her application for DIB on September 1, 2005, alleging a disability onset date of February 26, 1999. Plaintiff claimed that reflex sympathetic dystrophy syndrome[1] ("RSDS") and cellulitis in her left foot prevented her from

---

[1] Social Security Rule 03-2p defines RSDS, also known as complex regional pain syndrome ("CRPS"):

> RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS/CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time.

working.  That application was denied both on initial review and on reconsideration.  Plaintiff sought an administrative hearing, which was held on July 17, 2007 before the ALJ.  On July 27, 2007, the ALJ issued his opinion denying Plaintiff entitlement to DIB.  Plaintiff sought review of that decision, and the Appeals Council denied that request.  Thus, the decision of the ALJ became the final decision of the Commissioner.  Plaintiff timely filed this action.

**B.   ALJ Opinion**

The ALJ first found that Plaintiff met the insured status requirements for disability benefits through December 31, 1999, pursuant to 42 U.S.C. § 423(c).[2]  (R. at 17, 19.)  Thus, Plaintiff was required to show disability on or before December 31, 1999 in order to be entitled to DIB.  (R. at 17.)

The ALJ laid out the five steps of analysis required by the regulations.  (R. at 17-19.)  At step one, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since February 26, 1999.  (R. at 19.)  At step two, the ALJ found that Plaintiff suffered from a severe impairment -- "tear of the left posterior tibial tendon"[3] -- during the relevant period.  (Id.)

_____

[2] This fact is not in dispute.

[3] The tibial tendon is a fibrous cord of connective tissue attached to the tibia (the inner and larger of the leg bones below the knee, otherwise known as the shin).  See Stedman's Medical Dictionary, 1944, 1989 (28th ed. 2006).

At step three, the ALJ found that this impairment does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

At step four, the ALJ first found that for the relevant period, Plaintiff had the residual functional capacity to perform the full range of sedentary work.  (R. at 19-22.)  According to the ALJ, Plaintiff "had the residual functional capacity to lift and/or carry up to 20 pounds and to stand and/or walk for 2 hours in an 8-hour workday, and was not otherwise limited."  (R. at 22.)  The ALJ based his opinion, in part, on Plaintiff's testimony that in 1999 "she retained the ability to walk her daughter 1 block to school; to stand for 30 minutes; to prepare meals; and to dust and do other light housework."  (R. at 21-22.) He highlighted Plaintiff's testimony "that she was unable to work full-time in 1999 due to childcare."  (R. at 22.)  Though the ALJ found that Plaintiff is currently diagnosed with RSDS, he concluded that this condition did not arise until after she had surgery in December, 2000.  (Id.)  In support of this conclusion, the ALJ referred to the radiology reports from 1999, a report from Dr. Daniel DeMeo, and the March 3, 2006, report from the neurologist Dr. Robert Schwartzman.  (R. at 20-21, 22.)  That letter reports that Plaintiff began experiencing severe pain and swelling in both lower extremities "following a report of a torn

4

posterior tibial tendon in the left foot in the year 2000." (R. at 20, 352.)

The ALJ discounted Dr. DeMeo's opinion that Plaintiff has been incapable of performing any type of remunerative work since July of 1999. (R. at 20, 22.) The ALJ found Dr. DeMeo's conclusion to be "unsubstantiated by the medical evidence of record, including his own report and treatment notes" and contradicted by Plaintiff's own testimony. (R. at 22.) The ALJ also found that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her injury during the relevant period was "not entirely credible." (Id.) The ALJ summarized his findings:

> At best, the medical evidence of record establishes that [Plaintiff] was limited in her ability to stand and/or walk. The undersigned will give the claimant the benefit of the doubt and assume that her limitations in standing and/or walking reduce her ability to lift and/or carry heavy objects.
>
> Thus, after reviewing the evidence of record, the undersigned finds that from February 28, 1999 through December 31, 1999, [Plaintiff] had the residual functional capacity to lift and/or carry up to 20 pounds and to stand and/or walk for 2 hours in an 8-hour workday, and was not otherwise limited.

(Id.)

Continuing with the step four analysis, the ALJ found that Plaintiff was able to perform her past relevant work as an account payable clerk as that work is generally performed in the national economy. (Id.) The job is sedentary and "requires an

5

individual to lift no more than 10 pounds and to stand and/or walk for no more than 2 hours in an 8-hour workday." (Id.)

The ALJ did not proceed to step five, but instead found that Plaintiff was not under a disability during the relevant period from February 26, 1999 to December 31, 1999. (R. at 23.) The ALJ then denied her application for DIB. (Id.)

**C. Evidence in the Record**

1. Pre-December 31, 1999 Medical Records

As the ALJ correctly noted, there are very few relevant records from the period of time at issue in this case.[4] The earliest record regarding Plaintiff's lower extremities is a radiology report dated May 13, 1999 of an x-ray of Plaintiff's left foot taken in response to Plaintiff's complaint of pain in her left foot. (R. at 163.) The report found: "There is no fracture, dislocation or other significant bone pathology. The soft tissues are unremarkable." (Id.) A radiologist report dated July 23, 1999 documents an MRI performed on Plaintiff's left ankle after Plaintiff reported "ankle pain and swelling with instability which is worse in bad weather." (R. at 166.) The

_____

[4] A large portion of the medical records included in the administration record do not involve the alleged disability at issue here, and instead focus on Plaintiff's other medical difficulties involving, inter alia, her ears, her stomach, and her intestines. It has not been argued, and in fact there was testimony to the contrary (R. at 492), that any of these other difficulties interfered with Plaintiff's ability to work, and so the Court will not summerize those documents here.

MRI showed "possible synovitis[5] of the tibialis posterior tendon sheath with adjacent soft tissue swelling," but "no evidence of a tendon or ligament tear at the ankle."  (Id.)  These two reports are the only contemporaneous documents regarding Plaintiff's medical condition during this period.

 2. <u>Post-December 31, 1999 Medical Records</u>

 The medical evidence prepared after Plaintiff's date of last insured reveals Plaintiff's deteriorating medical condition.  A subsequent MRI from September 8, 2000, showed "a complete focal tear of the posterior tibialis tendon."  (R. at 164.)  This information was passed to Dr. DeMeo on September 11, 2000, (R. at 179), who admitted Plaintiff on December 28, 2000, noting that she complained of "pain in [the] left foot and ankle for [the] past year and [a] half," (R. at 419).  Dr. DeMeo's notes regarding the history of Plaintiff's left foot and ankle pain state:

> Patient made a mis-step in 3/99 and was seen by her LMD who had some x-rays made.  These were reported as negative.  Patient initially seen by me on 7/8/99 at which time examination was indicative of posterior tibial tendon dysfunction.  An MRI study was made and the patient was placed in an ankle support and started on anti-inflammatory medication.  She continued with discomfort and a repeat MRI study was made on 9/8/00 and this showed a complete focal tear of the posterior tibial tendon at the medial melleolus.  Patient is

---

 [5] Synovitis is inflammation of a joint membrane.  <u>Stedman's Medical Dictionary</u>, 1922.

admitted for repair, augmentation and calcaneal osteotomy.

(R. at 406.)  Dr. DeMeo went on to note: "Patient enjoys good general health."  (Id.)

On that same day, December 28, 2000, Dr. DeMeo performed surgery to correct the tear by inserting a screw into Plaintiff's ankle.  (R. at 176.)  Following the surgery, Dr. DeMeo prescribed crutches and morphine.  (R. at 414-17.)

On July 20, 2001, Dr. DeMeo reported that Plaintiff "[i]nitially did well" following the December, 2000 surgery, but later developed "ulceration" around the wound that was treated with antibiotics.  (R. at 360.)  On that day Dr. DeMeo performed a second surgery to remove the screw placed during the December surgery.  (R. at 169.)  Once again, Dr. DeMeo prescribed crutches and also noted that Plaintiff "may walk on [her] left foot."  (R. at 359.)

The first reference to Plaintiff's RSDS in the record appeared in October, 2002.  On October 28, 2002, Dr. John Santoro wrote a report in regarding Plaintiff's intestinal problems as well as heartburn, "which started with the initiation of Daypro for her RSD."  (R. at 146.)

By June 10, 2003, Plaintiff was being treated by neurologist Dr. Russell Abrams, who stated: "She has been diagnosed with reflex sympathetic dystrophy of the left foot and this apparently

occurred after surgery to repair a tendon in the left foot."  (R. at 475.)

On March 3, 2006, Dr. Robert Schwartzman, Professor and Chairman at Drexel University College of Medicine's Department of Neurology, examined Plaintiff.  (R. at 352-54.)  Dr. Schwartzman reported:

> [Plaintiff] is 49 years old, and comes in today with a chief complaint of severe pain and swelling in both lower extremities.  The patient states that her problem began following a repair of a torn posterior tibial tendon in the left foot in the year 2000.  The patient relates that following surgery she had complicated episodes of cellulitis.  Shortly after the surgery, she noted swelling, color change, burning pain, and hypersensitivity in the left leg.  Gradually, this problem spread to her right leg.

(R. at 352.)  He diagnosed her condition as severe chronic regional pain syndrome.  (R. at 354.)

On May 4, 2006, Dr. Schwartman prepared this letter:

> It is medically necessary for [Plaintiff] to receive Intravenous Lidocaine Infusion Therapy for refractory, total body RSD/CRPS-1 (Reflex Sympathetic Dystrophy/Complex Regional Pain Syndrome Type-1).
> Complex Regional Pain Syndrome (CRPS), also known as Reflex Sympathetic Dystrophy (RSD), is a chronic painful illness that usually follows relatively minor trauma to a limb.  It is characterized by spontaneous pain or hyperalgesia not limited to a single nerve territory, which is disproportionate to the inciting noxious event.
> At some point in the course of the illness, patients present with, or report, edema and skin blood flow (temperature) or sudomotor abnormality in the distal part of the affected limb.  Many patients report feeling pain elicited by an innocuous stimulus (allodynia).  Many also

> experience a spread of symptoms to the
> contralateral limb, all limbs, or even to the
> entire body. This condition can totally debilitate
> a person to the point of needing assistance with
> the simplest tasks of daily living.
> . . . It is vitally important that [Plaintiff]
> receives this therapy to stop the progression of
> this disease or the patient's health will
> deteriorate further.

(R. at 347.)

### 3.   Report of Dr. Daniel R. DeMeo

Plaintiff relies heavily on Dr. DeMeo's February 17, 2006 report, in which he summarizes his treatment of Plaintiff and concludes that she has been unable to work since July, 1999. Dr. DeMeo explained that Plaintiff had been treated by his office, the Atlantic Shore Orthopaedic Association, LLC, since April 1, 1993, and came under his care in July, 1999. (R. at 477.) That report reads, in relevant part:

> [Plaintiff] came under my care in July 1999
> complaining of left foot and ankle pain. An MRI
> scan was done and there was seen a tear of the
> posterior tibial tendon. She was treated with an
> ankle support, various anti-inflammatory
> medications as well as injections into the tendon
> sheath. The examinee continued to complain of
> persistent foot-ankle pain with marked difficulty
> with all ambulatory activities. A repeat MRI study
> was made in 9/00 showing a complete tear of the
> posterior tibial tendon. Surgery was advised.
> [Plaintiff] underwent calcaneal osteotomy.
> [Plaintiff]'s post-operative course was slowed by
> the complication of superficial cellulitis which
> required intravenous antibiotics.
> On 7/20/01 the screw used for calcaneal osteotomy
> of the left heel was surgically removed. Sometime
> in 9/01 [Plaintiff] began to complain of her right
> foot and ankle as well as persistent discomfort in
> her left foot and ankle. The findings relative to

the left foot-ankle were indicative of a
complication specifically reflex sympathetic
dystrophy. [Plaintiff] has been treated with
various medications including Neurontin. I last
saw her in 7/05 at which time an Arizona brace for
the right foot was prescribed.
I do not feel that [Plaintiff] was capable of any
type of remunerative work from July 1999 to the
present time. Furthermore I believe that her
present bilateral leg problems will gradually
worsen. I therefore feel that she is totally and
permanently disabled from resuming any time of
remunerative work.

(Id.)

    4.  <u>Plaintiff's Testimony</u>

Plaintiff, a high school graduate, testified that for
seventeen years she worked as an accounts payable clerk, until
1994, when her daughter was born. (R. at 483-84.) From 1994 to
1999 she cared for her daughter, intending to get a part-time job
in sales when her daughter started kindergarten in 1999. (R. at
485-86.) Instead, in February 1999, she injured herself by
stepping down on a step and tearing "that tendon." (R. at 486.)
Following the injury, she was prescribed Vicodin,[6] but according
to Plaintiff it did not help with her pain. (R. at 489-90.) She
was also prescribed a brace for her foot. (R. at 489.) At some
point she went to see Dr. DeMeo. (R. at 490.)

Plaintiff testified that on a typical day in the fall of
1999, she would walk her daughter one block to school and

---

[6] Vicodin is an opiate-based pain-reliever designed for the
"relief of moderate to moderately severe pain." <u>Physician's Desk
Reference for Prescription Drugs</u>, "Vicodin tablets" (2007).

occasionally she volunteered at her daughter's school, sitting
through her lunch period and helped in her forty-five minute
science class.  (R. at 486-87.)   She later testified that "just
a couple months" she stopped volunteering, because she "couldn't
even walk" to the school.  (R. at 486-87, 490.)

At home, she would dust, do laundry, and prepare meals.  (R.
at 487.)  She did not vacuum because she couldn't "push off on
[her] foot."  (<u>Id.</u>)  She would not go shopping by herself,
because she could not drive and "it was hard for [her] to walk."
(R. at 488.)  She would also go to church services, which lasted
thirty-five to forty minutes.  (<u>Id.</u>)  At that time, she was able
to kneel.  (<u>Id.</u>)

Plaintiff further testified that in the fall of 1999 she
could stand for approximately one-half an hour before she had to
sit and similarly that she could sit for one-half an hour before
she had to stand and move around.  (R. at 490.)  She was able to
lift ten pounds.  (R. at 491.)  She did have difficulty going up
and down steps.  (R. at 491.)

She explained that she had had other, serious, medical
difficulties involving her ear and her stomach, but she was able
to continue working during those difficulties.  (R. at 491-92.)
She testified that she could not have worked after injuring her
ankle and while she was volunteering at her daughter's school.

12

(R. at 488).  When the ALJ asked why she could not have worked, she explained:

> A.  Well, first of all I couldn't work that many hours because I had to take care of my daughter. Aside from that, I was being treated for my foot.
> Q.  How often were you being treated?
> A.  I can't remember exactly.  Maybe every couple of weeks.  I'm not sure.

(R. at 489.)

Two years after her initial injury, in December, 2000, she had surgery on her ankle.  (R. at 489.)  Her doctors told her that for those two years "they were treating it in hopes that it would get better."  (Id.)  In July, 2001, she underwent a second surgery on her foot to remove the screw that had been placed there, because she was "having such a bad reaction" to the screw. (R. at 493.)  After this second surgery she began having pain in her right foot as well.  (Id.)

## II.  DISCUSSION

### A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Social Security benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan,

13

970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical

14

evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

## B.  Disability Defined

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  This definition presupposes a regular, continuing, and sustained ability to perform such work.  Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."

2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."

4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."

5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable

17

to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  <u>Kangas</u>, 823 F.2d at 777.

In addition to establishing disability, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c) to be eligible for benefits.  Where claimant's insured status expired before he applied for DIB, the claimant must "demonstrate, therefore, that on or before that date he was prevented from performing any substantial, gainful activity by reason of medically determinable impairment which continued to the time he filed his application."  <u>De Nafo v. Finch</u>, 436 F.2d 737, 739 (3d Cir. 1971).  In the present case, it is undisputed that Plaintiff's last date of insured status was December 31, 1999 and Plaintiff must establish disability before that date.

**C.   Analysis**

1.   <u>Whether the ALJ Improperly Rejected the Conclusion of Treating Physician Daniel DeMeo that Plaintiff Has Been Unable to Work Since July, 1999</u>

_____   Plaintiff argues the ALJ improperly substituted his opinion for that of Dr. DeMeo when the judge concluded that Plaintiff had a residual functional capacity that permitted her to do sedentary work prior to December 31, 1999.  Plaintiff further maintains that Dr. DeMeo's opinion, if given proper weight, proves that Plaintiff's RSDS became disabling prior to her date of last insured.  For the reasons next discussed, the Court rejects both

18

arguments, because Dr. DeMeo's conclusion that Plaintiff was
unable to work beginning in July, 1999 is entitled to no weight
and is unsubstantiated and further because Dr. DeMeo did not find
that Plaintiff suffered from RSDS prior to December 31, 1999.

Although the ALJ must examine all evidence of record,
treating physicians have important perspectives on claimants'
impairments, as the Commissioner recognizes:

> Generally, [the Social Security
> Administration] give[s] more weight to
> opinions from your treating sources, since
> these sources are likely to be the medical
> professionals most able to provide a detailed,
> longitudinal picture of your medical
> impairment(s) and may bring a unique
> perspective to the medical evidence that
> cannot be obtained from the objective medical
> findings alone or from reports of individual
> examinations, such as consultative
> examinations or brief hospitalizations. If we
> find that a treating source's opinion on the
> issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the
> other substantial evidence in your case
> record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). "[T]he ALJ must . . . pay close
attention to the medical findings of a treating physician."
Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986).
Statements by a physician that a claimant is or was "unable to
work," however, are not "medical opinions" but instead are
"opinions on issues reserved to the Commissioner because they are
administrative findings that are dispositive of a case."  20

C.F.R. § 404.1527(e)(1).  For this reason, the Third Circuit has found that the opinion of a treating physician that a claimant is unable to work[7] "is not the sort of treating source medical opinion entitled to any kind of weight."  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 n.2 (3d Cir. 2008) (citing 20 C.F.R. § 404.1527(e)(1)); Taylor v. Barnhart, 474 F. Supp. 2d 650, 662 (D. Del. 2007) ("It is within the ALJ's lone discretion to determine whether an individual is disabled or 'unable to work' under the statutory definition.")

The ALJ gave controlling weight to Dr. DeMeo's medical findings as outlined in his February 17, 2006 report, reciting those findings at length in his opinion.  (R. at 20.)  Further, the ALJ relied on those medical findings, at least in part, in rejecting Dr. DeMeo's ultimate conclusion that Plaintiff has been unable to perform any kind of work since July, 1999.  (R. at 22.) In fact, none of the ALJ's findings regarding Plaintiff's medical condition are contrary to Dr. DeMeo's medical findings as stated in his report.  The only point where the two differ is on the dispositive issue of disability, an area reserved for the ALJ. The ALJ was required to make this ultimate determination, guided by the extensive statutory and regulatory framework governing

---

[7] In Johnson, the treating physician opined that claimant's impairments made her "unable to perform not only her past relevant work, but several other jobs which were offered during the course of her Workers' Compensation claim."  529 F.3d at 203 n.2.

benefits under Title II, and was entitled to make this decision
without deference to Dr. DeMeo's suggestion to the contrary.  See
20 C.F.R. § 404.1527(e)(1); Johnson, 529 F.3d at 203 n.2.[8]

Moreover, even if in some circumstances a treating
physician's opinion that a claimant is unable to work is entitled
to weight,[9] the Court finds substantial evidence to support the

---

[8] The importance of reserving such a decision to the ALJ is
emphasized in the case at bar.  Though Dr. DeMeo concluded that
Plaintiff has been unable to work since July, 1999, he did not
did not determine Plaintiff's residual functional capacity, as
required by the regulations, beyond noting that at some point
Plaintiff had "marked difficulty with all ambulatory activities."
(R. at 477.)  There is no further discussion regarding how her
medical condition impaired her functioning, nor how the one
listed impairment prevented her from "all forms of remunerative
work."  If, as Plaintiff urges, the ALJ had given controlling
weight to Dr. DeMeo's conclusion that Plaintiff was unable to
work, such a finding would be dispositive of the case, and yet
would fail to meet the statutory and regulatory requirements to
establish a disability as defined by the Social Security Act.

[9] Though in Johnson the Third Circuit was clear that
opinions from treating physicians on issues reserved for the ALJ,
and in particular opinions regarding the claimant's ability to
work, deserve no weight, the Court recognizes that a Third
Circuit decision issued some months after Johnson could be read
to call that holding into doubt.  In Brownawell v. Comm'r Of Soc.
Sec., 554 F.3d 352 (3d Cir. 2008), the Third Circuit reversed the
decision of the ALJ, in part for rejecting the opinion of a
treating physician in its entirety.  Part of that physician's
opinion included a conclusion that Plaintiff could not work and
was disabled.  Id. at 355 ("In an October 26, 2001 letter,
[treating physician] Dr. Grem states that 'the frequency and
severity of [Brownawell's] migraines ... prevent her from working
in any type of fixed schedule.... [T]his illness dominates her
life to the extent that I consider her to be disabled.'").  The
Brownawell court makes no mention of Johnson or 20 C.F.R. §
404.1527(e).
    The Court finds Brownawell to be distinguishable from
Johnson and the case at bar, for in Brownawell the opinion of the
treating physician included true "medical opinion" consistent

ALJ's determination that Dr. DeMeo's opinion that Plaintiff has
been unable to work since July, 1999 was unsubstantiated and
therefore not dispositive.  Dr. DeMeo's own report limits
Plaintiff's problems prior to 2000 to a partial tear in her left
posterior tibial tendon, whose only impact on Plaintiff's
functioning was her difficulty in walking.  The other objective
medical evidence from the period shows a relatively minor problem
with Plaintiff's left foot and ankle.  Plaintiff's own testimony
regarding her actual functional capacity during this period
contradicts the doctor's conclusion that she could not work (as
the Court will discuss below).  The ALJ was not required to
accept Dr. DeMeo's opinion regarding Plaintiff's ability to work,
absent sufficient supporting medical evidence.  <u>See</u> 20 C.F.R. §
404.1527(d)(2); <u>Johnson</u>, 529 F.3d at 202 ("[T]he treating
source's opinion is entitled to controlling weight only when it
is 'well-supported by medically acceptable clinical and

---

with 20 C.F.R. § 404.1526(e) regarding the frequency and severity
of the claimant's impairment, yet the ALJ rejected the entire
opinion without sufficient justification, whereas the specific
opinions at issue in <u>Johnson</u> and here (and the only opinions the
ALJ rejected) were solely the ultimate conclusion regarding
ability to work.  <u>See</u> <u>Johnson</u>, 529 F.3d at 203 n.2.  The <u>Johnson</u>
court specifically distinguished between the medical findings of
the treating physician, which generally must be given great
weight, and the ultimate conclusion regarding the ability to
work, which is given no weight.  <u>Id.</u> at 202-203, 203 n.2.  Taken
together <u>Brownaville</u> and <u>Johnson</u> reaffirm the requirement that
the ALJ properly weigh well-supported medical opinions, but
should not abdicate his or her role on the dispositive question.
Certainly, nothing in <u>Brownaville</u> can be read to reject or
minimize 20 C.F.R. § 404.1526(e).

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record....'") (quoting <u>Fargnoli</u>, 247 F.3d at 43).

Furthermore, contrary to Plaintiff's suggestion, Dr. DeMeo did not opine that Plaintiff began to suffer from RSDS prior to December 31, 1999. Instead, Dr. DeMeo reported that in 1999 Plaintiff was diagnosed with a tear in her posterior tibial tendon. (R. at 477.) He went on to report that "sometime in 9/01" Plaintiff began to have pain in her right foot and ankle, along with "persistent discomfort in her left foot and ankle." (<u>Id.</u>) Next, he explained: "The findings relative to the left foot-ankle were indicative of a complication specifically reflex sympathetic dystrophy." (<u>Id.</u>) The ALJ did not reject this opinion, but instead found that Plaintiff did not suffer from RSDS until after December 31, 1999, and suffered only from a tear of the left posterior tibial tendon during the relevant period. (R. at 19, 20.) In other words, Dr. DeMeo found that the constellation of symptoms comprising RSDS arose as a post-surgical "complication" after the December 28, 2000 tendon surgery. Therefore, the ALJ gave controlling weight to the medical findings in Dr. DeMeo's report, and properly gave no weight to Dr. DeMeo's conclusion regarding Plaintiff's ultimate disability.

                    2.   Whether the ALJ Failed to Properly Determine the
                         Plaintiff's Residual Functional Capacity

     Plaintiff argues that the ALJ erred in determining
Plaintiff's residual functional capacity to perform past work
because he failed to apply the required function-by-function
analysis and he improperly discredited Plaintiff's testimony
regarding the pain she suffered.  The Court finds that the ALJ
applied the appropriate legal principles to calculating
Plaintiff's RFC, and while the Court might not have reached the
same conclusion, there is substantial evidence to support the
ALJ's conclusion that Plaintiff could perform sedentary work
prior to December 31, 1999.

     The sequential evaluation process for determining disability
requires an assessment of the claimant's functional limitations
and her remaining capacities for work-related activities,
referred to as the claimant's residual functional capacity
("RFC").  See SSR 96-8P.  A claimant's RFC represents her maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis.[10]  Id.  The RFC
assessment is a function-by-function assessment based upon the
relevant evidence of the claimant's ability to do work-related
activities.  Id.  A function-by-function assessment includes an

―――――――――――――

     [10]  A "regular and continuing basis" means eight hours per
day for five days a week, or an equivalent work schedule.  See
SSR 96-9P.

                                24

assessment of a plaintiff's physical abilities, mental abilities, and any other abilities affected by his impairments and how limitations regarding those abilities may affect his ability to do work on a regular and continuing basis.  20 C.F.R. §§ 416.945(b)(c)(d), 404.1545(b)(c)(d).   The assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  Id.

The assessment of the claimant's RFC is used at Steps Four and Five of the sequential evaluation process to determine whether the claimant is able to do past relevant work or other work which exists in the national economy.  Id.  The ALJ must consider all relevant evidence when determining an individual's residual functional capacity at Step Four, see Fargnoli, 247 F.3d at 41, and must consider limitations imposed by all of an individual's impairments, even those that are not "severe."  See SSR 96-8.  Such evidence includes medical records, lay evidence, effects of symptoms, including pain that are reasonably attributed to a medically determinable impairment, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  Fargnoli, 247 F.3d at 41; see also SSR 96-9p.  Additionally, the ALJ's findings of residual functional capacity must "be accompanied by a clear and

25

satisfactory explanation of the basis on which it rests."
Cotter, 642 F.2d at 704.

Plaintiff first challenges the ALJ's RFC determination on
the grounds that the ALJ did not properly apply the function-by-
function analysis outlined above.  The Court cannot agree.  The
ALJ opinion includes a narrative discussion of the evidence,
medical and otherwise, showing that Plaintiff had pain in her
left foot and ankle due to the tear in her posterior tibial
tendon that impaired her ability to walk.  (R. at 19-22.)  The
ALJ concluded:

> At best, the medical evidence of record establishes
> that the claimant was limited in her ability to
> stand and/or walk.  The undersigned will give the
> claimant the benefit of the doubt and assume that
> her limitations in standing and/or walking reduce
> her ability to lift and/or carry heavy objection.

(R. at 22.)  The ALJ then found Plaintiff "had the residual
functional capacity to lift and/or carry up to 20 pounds and to
stand and/or walk for 2 hours in an 8-hour workday, and was not
otherwise limited" from February 28, 1999 (the alleged onset
date) and December 31, 1999 (the end of her insured status).[11]
(Id.)  Finally, the ALJ found that Plaintiff's past work as an

---

[11] Though the ALJ did not expressly state that Plaintiff
could perform these functions on a regular and continuing basis,
the RFC is "the individual's maximum remaining ability to do
sustained work activities in an ordinary work setting on a
regular and continuing basis," SSR 96-8p, and there was no need
for the ALJ to make a separate finding.  Whether this finding is
supported by substantial evidence is discussed below.

accounts payable clerk is sedentary as performed in the national
economy, such that it requires "an individual to lift no more
than 10 pounds and to sand and/or walk for no more than 2 hours
in an 8-hour workday." (Id.)  The ALJ concluded that Plaintiff's
RFC permitted her to perform her past relevant work as it is
generally performed in the national economy.  (Id.)  The ALJ
properly performed the RFC analysis required of him.

Moreover, the ALJ's RFC finding is supported by substantial
evidence.  The ALJ based his opinion on the objective medical
evidence from the relevant period as well as Plaintiff's own
testimony regarding her abilities during this period.  (R. at 19-
22.)  The ALJ observed, correctly, that the objective evidence
from the relevant period revealed only that Plaintiff "had
possible synovitis and soft tissue swelling, but no bone
pathology and no tendon or ligament tear."  (R. at 22, 163, 166.)
The ALJ found that the subjective evidence (both contemporaneous
and in Dr. DeMeo's retrospective report) indicated Plaintiff
complained of pain in her left foot and ankle and of difficulty
walking.  (R. at 22, 163, 166, 447.)  Plaintiff's own testimony,
the ALJ noted, showed that during the period in question,
Plaintiff was regularly able to stand for thirty minutes at a
time, (R. at 490), walk her daughter one block to school,[12] (R.

---

[12] Plaintiff correctly points out that later in her
testimony she stated that after a month or two she volunteering
at her daughter's school because she had difficulty walking

27

at 486), prepare meals, (R. at 487), and dust and do other light
housework, (Id.). (R. at 21.) The ALJ further observed -- and
the record bears out this observation -- that when asked why she
was unable to work full-time in 1999, Plaintiff said that
childcare responsibilities prevented her from working, and then
added that medical appointments also interfered with work. (R.
at 22, 489.) Those medical appointments were only every few
weeks. (Id.) Finally, the ALJ relied on Dr. Schwartzman's
report conveying Plaintiff's own representation that "her problem
began following a repair of a torn posterior tibial tendon in the
left foot in the year 2000." (R. at 22, 352.) Taken together,
this evidence is substantial and supports the ALJ's RFC
determination that Plaintiff had a residual functional capacity o
perform sedentary work prior to December 31, 1999.

---

there. (R. at 487.) The ALJ explained that he found Plaintiff's
testimony regarding the "limiting effects of [Plaintiff's]
symptoms [were] not entirely credible." (R. at 22.)
      Furthermore, the ALJ does acknowledge Plaintiff's testimony
that she would only occasionally volunteer at her daughter's
school and that eventually she stopped because she could not walk
there. The ALJ summarized her testimony as follows: "At the
hearing in this matter, [Plaintiff] testified that in 1999, she
walked her 5-year old daughter 1 block to school every morning
and would sometimes volunteer at the school. However, she
indicated that she had to stop volunteering after a few months
due to foot pain." (R. at 20.)
      As the Court will discuss below, it was within the ALJ's
discretion to discredit Plaintiff's testimony regarding the
severity of her limitations. Brown v. Schweiker, 562 F. Supp.
284, 287 (E.D. Pa. 1983).

Plaintiff objects to the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible." (R. at 22.) The Court similarly declines to reverse on this point. It was for the ALJ to determine the extent to which Plaintiff's subjective complaints of pain interfered with her ability to work. 20 C.F.R. § 404.1529(c); SSR 96-8p. The ALJ is required to give serious consideration to the claimant's subjective complaints of pain, even though those assertions are not fully confirmed by the objective medical evidence, Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986), but the ALJ is not bound to accept unquestioningly the credibility of such subjective evidence. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). It is within the ALJ's discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of HHS, 504 F. Supp. 288 (E.D.N.Y. 1980)).

The ALJ did not abuse his discretion when he found Plaintiff's testimony regarding the extent and limiting effects of her pain "not entirely credible." Plaintiff's undisputed and unqualified testimony showed that she was capable of standing for thirty minutes at a time and doing light household work. (R. at

487, 490.)  When directly asked why she did not work during the relevant period, Plaintiff offered two reasons unrelated to her difficulties walking.  (R. at 489.)  The ALJ was entitled to credit the unbiased report from Dr. Schwartzman, not prepared for Plaintiff's disability application, which indicates Plaintiff's problem with pain and swelling in both lower extremities began after her surgery in 2000.  (R. at 352.)  This report does not contradict Dr. DeMeo's report, which describes Plaintiff's pain prior to December 31, 1999 as limited to her left ankle and foot. (R. at 477.)  Though this Court might have interpreted the above evidence differently, it cannot find that the ALJ abused his discretion in finding Plaintiff's statements regarding her alleged disability to be exaggerated, where that finding is supported by substantial evidence.

The Court therefore concludes that the ALJ appropriately analyzed Plaintiff's RFC, that this analysis is supported by substantial evidence, and that the ALJ properly concluded that Plaintiff's RFC prior to December 31, 1999 allowed her to perform her past relevant work as an accounts payable clerk as it is generally performed in the national economy.

    3.  Whether the ALJ Failed to Follow Social Security
        Ruling 83-20

Finally, Plaintiff argues that the ALJ erred by failing to seek the guidance of a medical advisor to determine the onset date of Plaintiff's RSDS and therefore the ALJ's finding that

30

Plaintiff suffered only from a tear in her left posterior tibial tendon prior to December 31, 1999 was not supported by substantial evidence.  Again, the Court disagrees.  The medical evidence in the record establishes that the onset date of Plaintiff's RSDS was after December 31, 1999 and so the ALJ was not required to obtain a medical advisor.

SSR 83-20 "recognizes that with slowly progressive impairments, including mental impairments, 'it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.'"  Spellman v. Shalala, 1 F.3d 357, 361 (5th Cir. 1993) (quoting SSR 83-20) (cited approvingly in Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001)).  The Ruling accordingly provides:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

SSR 83-20.

In the present case, it was not necessary for the ALJ to "infer" the onset date of Plaintiff's RSDS because medical reports clearly established that this particular syndrome did not develop until after Plaintiff's insured status expired.  Dr.

31

Schwartzman found, based on Plaintiff's own report, that her RSDS
symptoms did not occur until after her December, 2000 surgery.
(R. at 352-54.)  Dr. DeMeo reported that Plaintiff did not
develop signs of RSDS until 2001.  (R. at 477.)  The ALJ relied
on both reports when concluding that Plaintiff did not suffer
from RSDS prior to the expiration of her insured status and so
that opinion is supported by substantial evidence.

Plaintiff objects to this conclusion, relying on the Third
Circuit's opinions in Walton v. Halter, 243 F.3d 703 (3d Cir.
2001) and Newell v. Comm'r of Soc. Sec., 347 F.3d 541 (3d Cir.
2003).  The Court finds both cases distinguishable from
Plaintiff's claim.  In both Walton and Newell, the onset date was
ambiguous and therefore the ALJ's inference that it post-dated
the end of the claimant's insured status had no legitimate
medical basis.  Newell, 347 F.3d at 543-45; Walton, 243 F.3d at
705-06.  Furthermore, in Walton virtually all of the evidence
contradicted the ALJ's determination of the onset date, Walton,
243 F.3d at 709, and in Newell the ALJ improperly relied solely
on the absence of medical evidence to support his conclusion that
Newell's disabling condition originated after her insured status
expired, Newell, 347 F.3d at 547-548.  By contrast, here
substantial evidence supported the ALJ's finding that Plaintiff's
RSDS did not develop until her insured status expired.  The Court
finds no error in the ALJ's failure to consult a medical advisor

32

regarding the onset of Plaintiff's RSDS. <u>See Kirk v. Commiss'r of Soc. Sec.</u>, 177 F. App'x 205, 208-09 (3d Cir. 2006) (remand not appropriate under <u>Walton</u> where medical evidence supported ALJ's conclusion regarding onset date); <u>Kelley v. Barnhart</u>, 138 F. App'x 505, 509 (3d Cir. 2005) ("[T]he fact is that both the objective medical records and lay evidence tend to disprove Kelley's claim of disability prior [expiration of her insured status] . . . [and so] the ALJ was not required to obtain the assistance of a medical advisor to help him infer the onset date.")

## III. CONCLUSION

For the reasons stated above, this Court finds that substantial evidence exists in the record to support the final decision of the Commissioner finding the Claimant to be not disabled as defined under the Social Security Act for purposes of eligibility for Disability Insurance Benefits.  The accompanying Order to affirm is entered.


**June 18, 2009**                          **s/ Jerome B. Simandle**
DATE                                       JEROME B. SIMANDLE
                                           United States District Judge


33